IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| JMF, Inc. and WW, Inc., | ) | |
| | ) | Case No. 3:09-cv-73 |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| -vs- | ) | **ORDER GRANTING IN PART AND** |
| | ) | **DENYING IN PART DEFENDANT'S** |
| Medicine Shoppe International, Inc., | ) | **MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendant. | ) | |

Before the Court is Defendant Medicine Shoppe International, Inc.'s (hereafter "MSI") Motion for Summary Judgment (Doc. #56). Plaintiffs have responded to the motion. The Court, having carefully reviewed the record and the arguments of the parties, now issues this memorandum opinion and order.

### I. SUMMARY OF DECISION

Genuine issues of material fact preclude summary judgment on Plaintiffs' claims for breach of contract for failure to honor the "most favored nations" clause and for the alleged violation of N.D. Cent. Code Ch. 51-19. Plaintiffs other alleged breach of contract claims, including failure to provide bookkeeping and accounting services, failure to provide advertising, and failure to provide "guidance" fail as a matter of law and are hereby dismissed from this action.

### II. FACTUAL BACKGROUND

JMF, Inc., is a North Dakota corporation operating a pharmacy in Jamestown, North Dakota (Doc. #57-9, Dep. Fugleberg at pp. 43, 58). John Fugleberg owns all of the stock of

1

JMF, Inc. Id. at p. 58. Pursuant to a franchise agreement with MSI, Fugleberg operates a store known as The Medicine Shoppe. Id. MSI identifies Fugleberg's store as store #545. Id. at p. 13.

WW, Inc. is a North Dakota corporation operating a pharmacy in Fargo, North Dakota (Doc. #57-10, Dep. Wilhelm at pp. 11-12). Robert Wilhelm is the sole shareholder of WW, Inc. Id. at p. 11. Pursuant to a franchise agreement with MSI, Wilhelm also operates a store known as The Medicine Shoppe. Id. Wilhelm's son, Ross, manages the day-to-day operations of the store. Id. MSI identifies Wilhelm's store as store #80.

MSI is a wholly-owned subsidiary of Cardinal Health (Doc. #57-16, p. 5). In 2003, Cardinal Health acquired Medicap (Doc. #59-1, Fiacco Dep. p. 20). Medicap became a wholly-owned subsidiary of MSI. At the time of the acquisition, there were approximately 250 to 300 Medicap stores. Id. at pp. 20-21. Until 2006 or 2007, there was a separate "team" of employees working with Medicap stores. Id. at pp. 21-22. After that, management of MSI and Medicap was integrated. Id.

MSI currently franchises approximately 700 prescription pharmacies nationwide (Doc. #59-2, Lane Dep. p. 13). In the past, MSI had as many as 1,500 independent franchises. Id. at p. 8. Over the years, as part of its franchise license agreement, MSI provided a number of services to its franchisees, including, for example, a call center and business support, franchise business consultants, advertising and marketing services and support, computer and pharmacy dispensing equipment arrangements and services, contracting arrangements with third-party payers, and accounting services (Doc. #57-22, Fiacco Dec. ¶ 4). In exchange for these services, MSI received license fees based on a percentage of the pharmacy's monthly revenues. Id. at ¶ 5.

Historically, the franchise license agreements called for a 20-year term, an initial flat fee, and then a monthly fee (typically between 4.1 to 5.5 percent of sales). Id.

During the past decade, the healthcare industry and the nature of retail pharmacy have changed drastically. Now, prescription prices are higher, reimbursement rates are lower, and most pharmacy sales are paid for by third-party payers (Doc. #57-22, Fiacco Dec. at ¶ 11). In an effort to develop new contracts with franchisees, MSI made broad-based changes to its franchise system. Id. at ¶ 13. These changes included reduced license fees and modifications to the way the parties paid for services such as advertising. Id. at ¶ 12. As for existing franchisees, renewal agreements allowed MSI and the franchisee to adjust the terms. Id. at ¶ 13.

In March 2009, MSI announced a total overhaul of its franchise program (Doc. #57-22, Fiacco Dec. at ¶ 14). Under the new program, the franchisee would pay a fixed monthly fee ($499) to MSI and services to the franchisee would be available on a "pay as you go" model. Id. at ¶¶ 14-15. To accommodate existing franchisees, MSI presented a modified version of its new format. The modified version offered existing franchisees three options: (1) pay a fee to MSI to convert to the modified version of the new format with the conversion price being a "steeply" discounted amount of the franchisee's projected future franchise fees under the former system; (2) pay MSI the projected future franchise fees under the former system and exit the system entirely through a "buyout" of the franchise agreement; or (3) remain under the existing contract with the same level of services. Id. at ¶ 17.

At the time of the overhaul, some of the franchisees were operating under a renewal

agreement containing a "most favored nations" clause[1]; therefore, the new format could not be offered to new franchisees without allowing "most favored nations" franchisees to opt-in at no cost to them (Doc. #57-22, Fiacco Dec. at ¶ 18). Due to the loss of income MSI would endure in allowing these existing franchisees to opt-in at no cost, MSI only offered Option 1 (a discounted conversation price) to franchisees like JMF, Inc. and WW, Inc., who hold "most favored nations" clauses. Id. at ¶ 18. In states where a franchisee with a "most favored nations" clause has not reached an agreement with MSI, MSI has agreed it will not offer the new format of that brand of franchise until it resolves issues with the existing franchisee. Id.

      A.     Store # 545

Under a license agreement executed in 1990 with WW, Inc., WW, Inc. was obligated to pay a 5.5 percent commission on net revenues after the seventh month of operation and continuing through the duration of the agreement (Doc. #57-7, p. 12 of 50). In 1998, JMF, Inc. purchased Store #545 from WW, Inc. (Doc. #57-9, Fugleberg dep. pp. 15-16). JMF, Inc. signed a franchise agreement with MSI. Id.; Doc. #57-15. Under the terms of the agreement, JMF, Inc.'s license fee rate was 5.5 percent of net revenues. Id. at p. 33; Doc. #57-15, p. 11 of 32.

In 2004, JMF, Inc. exercised its option to renew early its license agreement with MSI. The early renewal addendum provided for a continuing license fee equal to 4.1 of the gross receipts from December 30, 2004, through February 27, 2018, plus contribute to a business development fund a fee of .8 percent of gross receipts, for a total fee of around 4.9 percent of gross receipts (Doc. #57-9, Fugleberg dep. pp. 33-34; Doc. #57-1, p. 1 of 5). From February 28,

---

[1] This provision provided that if MSI later offered new or updated terms to new franchisees in the same state, the renewing store could, at no cost, adopt the latest agreement.

2018, through February 27, 2028, the continuing license fee would be 2.2 percent of gross receipts plus the same contribution to the business development fund.  Id.

The agreement further provided that fees contributed to the business development fund were to "be managed by the Company [MSI] or a business development trust established by the Company in its sole discretion from time to time, without any obligation to continue such separate trust." (Doc. #57-2, p. 11).  The agreement further provided:

> Methods, media employed, contents of advertising, and terms and conditions of advertising campaigns and promotional programs, studies, initiatives and other expenditures related to the development or retention of business, shall be within the sole discretion of the Company or if applicable, the business development trust.  There shall be no requirement that all or any part of the fund be disbursed within any accounting period.  Selection of media and locale for media placement shall be at the sole discretion of the administrator of the fund at the Company or if applicable, the business development fund.  The Franchisee understands that the business development fund is intended to maximize the business generated and retained throughout the Franchise Network, and that the Company accordingly undertakes no obligation to insure that any individual franchisee benefits directly on a pro rata basis from the expenditures of the fund or from the placement, if any, of advertising or marketing.

Id.  In addition to the identified advertising services, MSI agreed to provide accounting and bookkeeping services  (Doc. #57-2, ¶ 22).  It is undisputed there were complaints from franchisees regarding MSI's accounting and bookkeeping services (Doc. #59-1, Fiacco Dep. pp. 44-46).

Despite the identified services, John Fugleberg asserts he executed the renewal agreement in 2004 "primarily" because it contained a "most favored nations" clause (Doc. #62, ¶ 5), which reads in its entirety:

> 7.) <u>Most Favored Nations Clause</u> - If at any time during the term of the New Agreement, the Company is offering a new form of license agreement to all new franchisees in the state in which the Business is located, the Franchisee shall have the

option of converting the New Agreement to the new form of agreement for the remaining term of the New Agreement (as amended by this Addendum). The Franchisee will not be required to pay any new initial fee to the Company in connection with the execution of that agreement, nor shall the Company be obligated to provide any pre-opening services to the Franchisee that it would provide to new franchisees under such agreement prior to the opening of their business, but otherwise, both the Company and the Franchisee shall be bound by the provisions of such new agreement, which shall take the place of all the provisions of the New Agreement upon its execution by the Franchisee and the Company. This conversion right shall apply only to a new form of license agreement then being offered to new franchisees seeking to become members of the Franchise Network, and shall not apply to any negotiated amendments to the current form of franchise agreement used by the Company or any subsequent form of agreement that may have been granted to any individual franchisee based upon its unique circumstances. In addition, no amendments to the New Agreement shall carry forward into the new form of license agreement, except for the terms of this Addendum.

(Doc. #51-1, p. 4 of 5). Fugleberg was led to believe that under this clause, "if a better deal ever came along, I would get the better deal." (Doc. #62, ¶ 5). He also believed that MSI intended to continue to grow its franchises in North Dakota. Id. at ¶ 6.

  B. Store # 80

In 1990, Robert Wilhelm purchased what is referred to in MSI's system as Store # 80 (Doc. #57-10, Wilhelm Dep. p. 12). Wilhelm also owns another store in Fargo, but it is not subject to this litigation. Id. at ¶ 13. At the time Wilhelm purchased Store # 80, his license fees were 4 percent for the duration of the license agreement. Id. at p. 20. The fee was lower because Wilhelm owned Store # 545 at the time. Id. When he executed a new license agreement, MSI raised the fees to 5.5 percent. Id.

In 2005, pursuant to an early renewal agreement, MSI and Wilhelm of behalf of WW, Inc. negotiated a monthly license fee effective March 1, 2010, of 2.2 percent plus a contribution to the business development fund of .8 percent of sales. Id.; Doc. #57-6, p. 1 of 5. The renewal

agreement contains the same provisions regarding the business development fund and the "most favored nations clause" as those recited in the previous section (Doc. #57-5, p. 12 of 23; Doc. #57-6, p. 4 of 5).

Wilhelm contends he was induced to enter the early renewal agreement due to the representations that the "most favored nations" clause allowed him to obtain a better deal if one came along (Doc. #61, Aff. Wilhelm ¶ 2). MSI represented to Wilhelm that the renewal agreement was a "win/win situation" because he would lower his fees and the contract allowed him to convert to a new agreement if one came along. Id.

In 2009, MSI filed with the North Dakota Securities Commissioner a document entitled "Franchise Disclosure Document for Prospective Franchisees"(Doc. #57-16). The Franchise Disclosure Document (hereafter "FDD") outlines the parameters for a franchisee operating under the Medicine Shoppe name and provides for a continuing license fee of $499 per month. Id. at p. 22 of 36. The FDD also projected "0-1" openings in North Dakota, as of June 30, 2008 (Doc. #57-17, p. 36 of 39). Plaintiffs JMF, Inc. and WW, Inc. tried to convert their renewal agreement to the new terms contained in the FDD, believing the "most favored nations" clause allowed them to do so. MSI has refused to allow such a conversion. Instead, in the 10 states where franchisees like Plaintiffs hold a "most favored nations" clause in their contract, MSI has declined to offer new franchises under a particular trade name (Doc, #59-1, Fiacco Dep. p. 32). MSI has decided not to offer or promote any new Medicine Shoppe franchises to avoid triggering these "most favored nations" clauses. Id. at p. 33. It will, however, offer Medicap franchises in North Dakota. Id. at p. 56.

Plaintiffs JMF, Inc. and WW, Inc. have brought this action alleging breach of contract

7

and violations of N.D. Cent. Code § 51-19-11. For relief, Plaintiffs seek an order rescinding the contract, or, alternatively, an order requiring MSI to allow them to convert their present franchise agreement to the terms contained in the 2009 FDD. Additionally, Plaintiffs seek reimbursement for excess franchise fees paid since October 15, 1998, costs and disbursements, and reasonable attorney fees. MSI moves for summary judgment on all claims, asserting there has been no "offering" to trigger the "most favored nations" clause and thus no breach of contract, MSI has not failed to honor any provision in the contract, and there is no private cause of action under N.D. Cent. Code Ch. 51-19. Plaintiffs oppose the motion.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The burden is on the moving party to establish the basis for its motion. Donovan v. Harrah's Md. Heights Corp., 289 F.3d 527, 529 (8th Cir. 2002). It is axiomatic that the evidence is viewed in a light most favorable to the non-moving party, and the non-moving party enjoys the benefit of all reasonable inferences to be drawn from the facts. See, e.g., Vacca v. Viacom Broad. of Mo., Inc., 875 F.2d 1337, 1339 (8th Cir. 1989) (quotations omitted). If the moving party shows there are no genuine issues of material fact, the burden shifts to the non-moving party to set forth facts showing a genuine issue for trial. Donovan, 289 F.3d at 529.

A fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The basic inquiry is whether

the evidence presents a sufficient disagreement to require full consideration on the merits by a jury, or whether it is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., 418 F.3d 820, 832 (8th Cir. 2005).

When the unresolved issues in a case are primarily legal rather than factual, summary judgment is particularly appropriate. Mansker v. TMG Life Ins. Co., 54 F.3d 1322, 1326 (8th Cir. 1995). However, although summary judgment may be an appropriate and useful tool to avoid useless and time-consuming trials, "[it] should not be granted unless the moving party has established the right to a judgment with such clarity as to leave no room for controversy." Vacca, 875 F.2d at 1339 (citations omitted).

### IV. DISCUSSION

A breach of contract occurs when there is "nonperformance of a contractual duty when it is due." Van Sickle v. Hallmark & Associates, Inc., 744 N.W.2d 532 (N.D. 2008). The interpretation of a contract is a question of law; however, whether a party has breached a contract is typically a finding of fact. Id.

A. "Most Favored Nations" Clause

The "most favored nations" clause in the renewal addendum requires MSI to allow a franchisee to convert, without any new initial fee, to a new form of license agreement if one is offered. Plaintiffs contend the FDD statement filed with the North Dakota Securities Commissioner is a new offering. MSI contends it is a mere formality required by law and not necessarily an offering.

Genuine issues of material fact exist with regard to whether MSI has "offered" new stores in North Dakota sufficient to trigger the "most favored nations" clause. Not only is there the

9

disclosure filed with the state securities commissioner which raises fact issues inappropriate for summary judgment, but Medicap has admittedly been offered in North Dakota as a way to circumvent the "most favored nations" clause. Cardinal Health is the parent corporation for MSI and Medicap. MSI acquired all of the stock of Medicap in 2003 (Doc. #57-16, p. 6 of 36). Medicap is a wholly-owned subsidiary of MSI. Id. Medicap's principal offices are the same as MSI's. Medicap and MSI offer similar franchise programs. MSI acknowledges that "[a]ll of the goods and services that are offered in Medicap Pharmacy businesses are similar to the goods and services [offered] in . . . The Medicine Shoppe business." (Doc. #57-17, p. 11 of 39). MSI supports both Medicap and The Medicine Shoppe pharmacy systems. Id.

The "most favored nations" clause obligates MSI to allow a franchisee to convert when a new form of license agreement is being offered to new franchisees seeking to become members of the "Franchise Network." Viewing the evidence in a light most favorable to the non-moving party, a reasonable fact finder could determine that MSI's decision to offer Medicap is an "offering" that triggers the "most favored nations" clause in Plaintiffs' license agreements to operate The Medicine Shoppe.

MSI's motion for summary judgment on the breach of contract claim pertaining to the "most favored nations" clause is **DENIED**.

B.  Advertising Provisions

Plaintiffs alleged that MSI provided them with "little local advertising" and as a result failed to live up to its promises. The license agreement requires a percentage of revenues to be contributed to the business development fund to "be managed by the Company [MSI] or a business development trust established by the Company in its sole discretion from time to time,

without any obligation to continue such separate trust." (Doc. #57-2, p. 11). The agreement further provide:

> Methods, media employed, contents of advertising, and terms and conditions of advertising campaigns and promotional programs, studies, initiatives and other expenditures related to the development or retention of business, **shall be within the sole discretion of the Company** . . .. There shall be no requirement that all or any part of the fund be disbursed within any accounting period. Selection of media and locale for media placement **shall be at the sole discretion of the administrator of the fund at the Company** . . .. The Franchisee understands that the business development fund is intended to maximize the business generated and retained throughout the Franchise Network, and that the Company accordingly **undertakes no obligation to insure that any individual franchisee benefits directly on a pro rata basis from the expenditures of the fund or from the placement, if any, of advertising or marketing**.

Id. (emphasis added). While Plaintiffs allege they are unhappy with the level of advertising services received, including the belief that the advertising done in North Dakota "has provided little benefit to Plaintiffs", the contract clearly provides that the services will be provided at MSI's sole discretion. Viewing the facts and reasonable inferences in a light most favorable to the non-moving party, the Court finds that the plaintiffs have not raised a genuine issue of material fact on their breach of contract claim pertaining to advertising. As such, Plaintiffs' claim for breach of contract for poor or non-existent advertising services fails as a matter of law. MSI's motion for summary judgment to dismiss this claim is **GRANTED**.

    C.    <u>Accounting Provisions</u>

Plaintiffs maintain that MSI failed to provide a number of promised services. Among the unperformed promises was accounting services. Plaintiffs allege MSI promised early on in their relationship that MSI would furnish them with accounting services. MSI contracted with Plaintiffs as follows:

11

> C. ACCOUNTING SERVICES. We will furnish accounting services to you in the form of monthly and annual profit and loss statements of [the] financial condition of the Pharmacy. You agree to furnish timely sales and expense information in accordance with the format, methods of communication and procedures that we prescribe from time to time. . . . You may obtain such duplicate or additional accounting services for the Pharmacy as you determine may be appropriate.

(Doc. #57-15, p. 9 of 32; Doc. # 57-7, p. 10 of 50). It is undisputed that MSI received complaints from its franchisees about the quality and level of accounting services it was providing. Plaintiffs regularly received the accounting documents from MSI late. Both JMF, Inc. and WW, Inc. hired their own accountants to prepare financial statements. In 2010, MSI hired an independent accounting service to handle the financial statements and it appears many of the problems have been resolved.

Despite the problems with MSI's accounting services, Plaintiffs elected to renew their license agreements. In the renewal agreement, MSI required its franchisees, including JMF, Inc. and WW, Inc., to maintain its books and records in a reasonable manner, to use MSI's bookkeeping and accounting system in the operation of its business, and to maintain the books and records in a reasonable manner and in accordance with generally accepted accounting principles (Doc. #57-2, p. 7 of 32; Doc. #57-5, pp. 6-7 of 32). The renewal agreement did not contain the same provision regarding the furnishment of accounting services as did the earlier agreements.

Failure of consideration arises when a valid contract has been formed, but the performance bargained for has not been rendered. First Nat'l Bank of Belfield v. Burich, 367 N.W.2d 148, 152 (N.D. 1985). A total failure of consideration occurs where a party has failed to

perform a substantial part of its obligations, so as to defeat the very object of the agreement. Id. at 153. The remedy is to excuse the non-breaching party from performance of its obligations under the agreement. Id. In contrast, a partial failure of consideration occurs when there has been an insubstantial breach that leaves sufficient consideration for sustaining the contract. Id. The remedy for a partial failure of consideration is to award damages to the non-breaching party. Id. Whether there has been a failure of consideration, total or partial, is a question of fact. Id.

Because MSI failed to render a promised service, Plaintiffs claim one of the material terms of the agreement have been defeated. MSI argues that whatever problems Plaintiffs have had in the past with MSI's bookkeeping and accounting services, those problems have been accepted, cured, or both. It is indisputable that a novation of the contract occurred when Plaintiffs entered into the renewal agreements. North Dakota law defines a novation as "the substitution of a new obligation for an existing one." N.D. Cent. Code § 9-13-08. Under general contract law, the requirements for a novation are: a previous valid obligation, an agreement of all the parties to the new contract, and an extinguishment of the old obligation for a new, valid obligation. State v. Morales, 673 N.W.2d 250, 254 (N.D. 2004). It is clear the parties intended to substitute the old obligations with new obligations when the renewal agreements were signed. Any liability under the old agreements for failure to provide accounting services has been extinguished and Plaintiffs have forfeited their right to bring a claim for the alleged breach.

Moreover, "[a] waiver occurs when a person voluntarily and intentionally relinquishes a known right or privilege." VND, LLC v. Leevers Food, Inc., 672 N.W.2d 445, 455 (N.D. 2003). Waiver can be established from acts or conduct. Id. Although the existence of waiver is typically a question of fact, if circumstances are admitted or clearly established and reasonable

persons can draw only one conclusion from those circumstances, the issue of waiver may be decided as a matter of law. Id. Assuming there has been no novation of the contract, Plaintiffs' actions in retaining their own accountant and not enforcing the alleged contractual breach reflect a pattern of conduct constituting a waiver. See Shervold v. Schmidt, 359 N.w.2d 361, 363-64 (N.D. 1984) (accepting several late monthly payments constituted waiver and precluded cancellation of the contract for deed). Plaintiffs' unexplained delay in enforcing alleged contractual rights and acceptance of performance of the contract in a manner different from that required by the contract constitutes an acquiescence of the nonconforming performance. See Dangerfield v. Markel, 252 N.W.2d 184, 191 (N.D. 1977).

MSI's motion for summary judgment dismissing Plaintiffs' alleged breach of contract claim pertaining to bookkeeping and accounting services is **GRANTED**.

D.    Guidance

Plaintiffs have alleged that MSI provided them "little guidance and training." (Doc. #36, Second Amended Complaint ¶ 25). They concede they have received some guidance from MSI. Their primary complaint is that they believe they are overpaying for the level of services they are actually receiving from MSI.

The current franchise license agreements executed by JMF, Inc. and WW, Inc. contain a provision relating to "guidance", which provides:

> The Company will make available such continuing training and guidance to the Franchisee through such periodic visits by the Company's personnel to the Business and the holding of periodic seminars, workshops, and equipment exhibits as the Company deems necessary or appropriate.

(Doc. #57-5, p. 3 of 32; Doc. #57-2, p. 3 of 32). The contract unambiguously provides that MSI

14

agreed to provide training and guidance as it deemed necessary and appropriate at its discretion. Plaintiffs have not offered evidence that the guidance provided was unreasonable or inappropriate or that they have gotten no guidance at all.

Plaintiffs have failed to present sufficient evidence to raise a genuine issue of material fact on their claim for breach of contract based on a failure to provide continuing training and guidance. MSI's motion for summary judgment on this claim is **GRANTED**.

E. <u>N.D. Cent. Code § 51-19-11</u>

Plaintiffs allege MSI has violated N.D. Cent. Code § 51-19-11 (Doc. #36, Second Amended Complaint ¶ 29). N.D. Cent. Code § 51-19-11 provides:

> 1. It is unlawful for any person knowingly to subscribe to or make or cause to be made any material false statement or representation in any application, financial statement, notice, report, or other document filed under any provision of this chapter or to omit to state any material statement or fact in any such application, financial statement, notice, report, or document which is necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to fail to notify the commissioner of any material change as required under subsection 6 of section 51-19-07.
>
> 2. It is unlawful for any person in connection with the offer, sale, or purchase of any franchise, directly or indirectly:
>
>> a. To employ any device, scheme, or artifice to defraud;
>>
>> b. To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>>
>> c. To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
>
> 3. It is unlawful for any person to violate any order of the commissioner or condition to the effectiveness of the registration of the offer or sale of franchises.

> 4. It is unlawful for any person to effect or attempt to effect a sale of a franchise in this state unless such person is identified in an application or amended application or prospectus filed with the commissioner.
>
> 5. It is unlawful for any person to represent or cause to be represented to any prospective purchaser of a franchise that the filing of any document under this chapter or the registration or exemption from registration of a franchise constitutes a finding by the commissioner that any document filed under this chapter is true, complete, and not misleading, or that the commissioner has passed in any way upon the merits of any franchise, or that a franchise is registered or exempted from registration when in fact such is not the case.
>
> 6. No action may be brought under this section by the commissioner after six years from the date of the alleged violation.

North Dakota Franchise Investment Law also contains a provision regarding civil liability. It provides that "any person who violates any provision of this chapter or any rule or order issued by the commissioner thereunder is liable to the franchisee or subfranchisor who may bring an action for damages, for rescission, or for such other relief as the court may deem appropriate." N.D. Cent. Code § 51-19-12.

MSI contends that N.D. Cent. Code Ch. 51-19 is not implicated in this litigation since the allegations are related to its alleged failure to perform under existing franchise agreements. MSI's argument ignores disputed issues of fact- that is, whether MSI made a material misstatement of fact in its FDD when it claimed to project opening 0-1 stores in North Dakota when in reality it did not intend to offer any Medicine Shoppe franchises in North Dakota so as to avoid triggering the "most favored nations" clause held by current franchisees. Plaintiffs also claim they were induced to enter into the renewal agreements because they were assured that if a better deal came along, they would be able to convert to it. If a fact finder finds that MSI

employed such a scheme as a way to defraud or commit deceit, it may also find a violation of the statute. Viewing the evidence in a light most favorable to the non-moving party, genuine issues of material fact exist with regard to whether MSI violated North Dakota's Franchise Investment Law.

MSI also asserts as a defense that there is no private cause of action under N.D. Cent. Code Ch. 51-19. The plain language of N.D. Cent. Code § 51-19-12 provides that a franchisee or subfranchisor may bring an action against "any person who violates any provision of this chapter." Actions between franchisees and franchisors alleging violations of N.D. Cent. Code Ch. 51-19 have been litigated in this Court and state court. See e.g., Check Control, Inc. v. Shepherd, 462 N.W.2d 644 (N.D. 1990); Fargo Biltmore Motor Hotel Corp. v. Best Western Int'l, Inc., 563 F.Supp. 1022 (D.N.D. 1983), affd, 742 F.2d 459 (8th Cir. 1984); Peck of Chehalis, Inc. v. C.K. of Western America, Inc., 304 N.W.2d 91 (N.D. 1981); Country Kitchen of Mount Vernon, Inc. v. Country Kitchen of Western America, Inc., 293 N.W.2d 118 (N.D. 1980). The plain language of the statute allows a franchisee to bring a claim against a franchisor under N.D. Cent. Code Ch. 51-19. MSI's motion for summary judgment on this claim is **DENIED** in its entirety.

## V. Conclusion

For the foregoing reasons, MSI's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**. Genuine issues of material fact preclude summary judgment on Plaintiffs' claims for breach of contract for failure to honor the "most favored nations" clause and for the alleged violation of N.D. Cent. Code Ch. 51-19. Plaintiffs other alleged breach of contract claims fail as a matter of law and are hereby dismissed from this action.

**IT IS SO ORDERED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated this 19th day of September, 2011.

                                            /s/ Ralph R. Erickson
                                            Ralph R. Erickson, Chief Judge
                                            United States District Court